UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAHARQA ALEEM and TAJIDDIN ALEEM,

                    Plaintiffs,

- against -

EXPERIENCE HENDRIX, L.L.C. and ROCK &
ROLL HALL OF FAME & MUSIC, INC.,

                    Defendants.

**OPINION AND ORDER**

16 Civ. 9206 (ER)

Ramos, D.J.:

       Jimi Hendrix, the world-renowned guitarist, gave two of his bandmates each a guitar soon before his death in 1970. After his death, Hendrix's estate purchased the guitars back from the bandmates for $30,000. Now, Plaintiffs — one of the bandmates and the other's brother — sue under a theory of promissory estoppel to enforce an alleged oral promise that allowed them to buy back the guitars at any time after giving notice and returning the $30,000 they received. The defendants now move for summary judgment. Because the Court finds as a matter of law that any injury suffered by Plaintiffs is not unconscionable, it GRANTS the defendants' motion for summary judgment of Plaintiffs' Second Amended Complaint. It also GRANTS the defendants' motion for summary judgment of its Counterclaim for Declaratory Judgment.

I.     BACKGROUND

       During his short career, Jimi Hendrix entertained audiences as a "world-renowned musician and guitarist." Resp. to Def.'s Rule 56.1 Statement of Purportedly Undisputed Material Facts ("Pls.' 56.1 Resp.") ¶ 17, Doc. 70. Prior to his death, Hendrix gifted two

guitars to the late Tunde Ra Aleem and Plaintiff Taharqa Aleem,[1] twins who were also known as the "Ghetto Fighters." *Id.* ¶¶ 1, 22.

One of the guitars is a Mosrite Joe Maphris brand doubleneck guitar, which Hendrix used to record "Spanish Castle Magic" for the album *Axis: Bold as Love*. *Id.* ¶¶ 22; Decl. of Dorothy M. Weber in Support of Def.'s Mot. for Summ. J. ("Weber Decl.") Ex. X at ECF p. 34, Doc. 63. Hendrix used the other, an Acoustic brand Black Widow electric guitar, in his recording of "Mojo Man," a song released in Hendrix's posthumous 2013 album *People, Hell, and Angels* and for which the Aleem twins were vocalists. Pls.' 56.1 Resps. ¶ 22; Weber Decl., Ex. X at ECF p. 35. Both guitars are currently displayed in the Rock and Roll Hall of Fame in Cleveland, Ohio as part of the collection of the defendant, Experience Hendrix, LLC.[2] Pls.' 56.1 Resps. ¶ 32, 33.

Experience Hendrix, formed alongside Authentic Hendrix, LLC by Jimi Hendrix's father Al Hendrix, holds, manages, and licenses the rights related to Jimi, who died in 1970. *Id.* ¶ 17, 18. In addition, Experience Hendrix acquires personal items owned by Jimi for its own collection and loans those items to museums and other organizations for display. *Id.* ¶¶ 19–21. Jimi's sister, Janie Hendrix, currently serves as Experience's president and CEO. Decl. of Janie Hendrix in Support of Def.'s Mot. for Summ. J. ("Hendrix Decl.") ¶ 1, Doc. 64.

---

[1] Their brother, Tajiddin, is also a plaintiff, claiming he is the successor in interest to Tunde Ra. Second Amended Compl. ¶ 9 n.1.

[2] Rock & Roll Hall of Fame and Music, Inc., the owner and operator of the Rock & Roll Hall of Fame, is named as a nominal defendant and represented by counsel for Experience.

### A. The Initial Sale of the Guitars

In 1995, the Aleem twins chose to place at least one of the guitars up for public auction in response to an unexpected personal expense. Pls.' 56.1 Resps. ¶ 23; Decl. of Taharqa Aleem in Opp'n ("Taharqa Decl.") ¶ 18, Doc. 79. Experience discovered the auction and offered to acquire possession of the guitars for $30,000. Hendrix Decl. ¶¶ 6, 8. The twins accepted, and Experience took possession of the guitars in late 1995 or 1996. *Id.*

Taharqa Aleem avers, however, that the deal was more than a simple purchase. He claims that Experience orally gave the twins the option of buying back the guitars at any time so long as they gave notice and returned the $30,000. Taharqa Decl. ¶ 8. Experience denies that it ever made such a promise, saying that it would have never given the twins a $30,000, zero-interest loan secured by the guitars — essentially what the Plaintiffs' version of the deal amounts to. Hendrix Decl. ¶ 7.

There was no writing memorializing the transaction. Pls.' 56.1 Resps. ¶ 27. As the twins wrote in a 2014 account of the deal, "with no written contracts, or anything other than [their] sacred words to each other . . . [the Ghetto Fighters and Experience] went [their] separate ways." Taharqa Dec. Ex. 2 at 7.

### B. Jack Cassin and the 2001 Negotiations

In 2001, a man named Jack Cassin reached out to Experience allegedly on behalf of Taharqa and Tunde Ra, seeking to negotiate a repurchase of the guitars. Weber Decl. Ex. P ("Cassin Decl.") ¶ 3. After phone conversations with an Experience representative, Cassin reached a tentative agreement detailing a transaction whereby the twins would pay Experience $80,000 and hand over master recordings of the Ghetto Fighters and Jimi Hendrix in exchange for Experience returning the guitars. *Id.* at ¶¶ 4, 6; Weber Decl. Ex.

3

Q § 3. The deal ultimately never went through, with Cassin averring that the twins could not pull together the required $80,000. Cassin Decl. ¶ 6. Neither Cassin, the Experience representatives, nor the draft agreements mention the 1995 oral promise to buy back the guitars for the price of $30,000.

Taharqa denies authorizing Cassin to engage in these negotiations. Taharqa Decl. ¶ 21, 22. In fact, Plaintiffs deny having any meaningful relationship with Cassin at all. In various court filings and discovery documents, Plaintiffs have described Cassin as "simply a friend," *id.* ¶ 20, Taharqa's landlord, *id.*, "never a manager for the Ghetto Fighters," *id.* ¶ 21, a "random stranger," Pls.' Response to Hendrix Defs.' Pre-Mot. Conference Letter at 3 (filed Feb. 3, 2017), Doc. 15, and "some random gentleman who never had authority to act on the Plaintiffs' behalf," *id.* Plaintiffs admit that they have discussed the present lawsuit and the guitars with Cassin several times over the years. Weber Decl. Ex. W ("Pls.' Interrogatory Resps.") at 3.

Cassin is also a party to a 2014 "Settlement Agreement" with the twins. Decl. of Dorothy M. Weber in Reply and in Further Support of Def.'s Mot. for Summ. J. Ex. A, Doc. 63. The agreement indicates that Cassin and the twins had conducted business together for thirty-five years, had worked together on "music publishing, record production, independent record label operations, literary, intellectual property exploitation and other matters related to the careers" of the Ghetto Fighters. *Id.* §§ 2(a), 2(c). The deal terminated the business relationship between Cassin and the twins, with the twins paying Cassin $75,000 in return for the surrender of several domain names, his agreement to not criticize the twins in writing or verbally, and his agreement to not hold himself out as having the authority to represent the twins in any capacity. *Id.* §§ 5(A),

5(B). Cassin himself avers that he was a "Business Partner and Manager" of the Ghetto Fighters for about twenty-four years. Cassin Decl. ¶ 2.

### C. The 2006 Seattle Meeting

Five years after the negotiations between Cassin and Experience, in January 2006, the Aleem twins met with Janie Hendrix in Seattle. Pls.' 56.1 Resps. ¶ 43. In addition to the Aleems and Hendrix, Linda Anderson, an Experience employee, attended and took notes, which she memorialized in a memorandum. *Id.* ¶ 44; Weber Decl. Ex. R ("Anderson Decl.") ¶ 4; Weber Decl. Ex. S ("Anderson Memo").

The parties agree — and the memorandum reflects — that the twins and Hendrix discussed matters regarding several previous interactions between Experience and the twins. *See* Anderson Memo at 2. The memorandum *also* indicates that the twins raised again the possibility of purchasing back the guitars from Experience, referring to a 1998 conversation with Wright, Hendrix's husband, and that Hendrix indicated that she would take this request to Experience's board of directors. See *id.* at 1. Although Hendrix and Anderson agree with this characterization of the meeting, Hendrix Decl. ¶ 14; Anderson Decl. ¶¶ 5, 6, Taharqa flatly denies there was any discussion of the guitars at all, Taharqa Decl. ¶ 26. Neither party has presented any indication that Hendrix discussed the request with Experience's board or otherwise followed up with the twins.

### D. The Present Lawsuit

Counsel for Plaintiffs sent a demand letter to Experience in September 2016, citing the alleged 1995 oral promise and asking that the guitars be returned in exchange for $30,000. Weber Decl. Ex. Z at ECF p. 5. After Experience did not reply, Plaintiffs filed suit in November 2016 in New York Supreme Court, alleging causes of action for replevin, conversion, breach of contract, promissory estoppel, and slander of title. Notice

5

of Removal, Doc. 1. Experience properly removed the case to the Southern District of New York that same month. *Id.*

Defendants filed a motion to dismiss in February 2017. Doc. 18. This Court granted in part and denied in part that motion in an opinion and order on July 17, 2017. *See Aleem v. Experience Hendrix, L.L.C.*, No. 16 Civ. 9206 (ER), 2017 WL 3105870 (S.D.N.Y. July 17, 2017). That opinion — finding that the enforcement of any contractual agreement was barred by the statute of frauds, *id.* at *5 — dismissed all claims except for the promissory estoppel claim, dismissed Tajiddin as a plaintiff for lack of standing, and granted Plaintiffs leave to replead their claims for replevin and conversion, as well as Tajiddin's standing. *Id.* at *8.

Plaintiffs took advantage of that leave and filed a First Amended Complaint in August 2017, Doc. 29, followed by a Second Amended Complaint in November 2017 that limited their claims to one based on promissory estoppel and that properly pleaded Tajiddin's standing. Doc. 44 ("SAC"). Experience answered the Second Amended Complaint one month later, also raising a counterclaim asking for a declaratory judgment that "Experience is the sole and exclusive owner of the Guitars and that Plaintiffs have no ownership or rights in the Guitars." Doc. 45 at 11 ("Answer"). In October 2018, Experience filed a motion for summary judgment dismissing the Second Amended Complaint in its entirety and granting its counterclaim for declaratory judgment. Doc. 61.

## II. STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is

'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). But "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo*, 536 F.3d at 145.

## III. DISCUSSION

Experience moves for summary judgment on two grounds: First, it argues that the six-year statute of limitations has expired, and, second, it argues that the Plaintiffs' promissory estoppel claim fails as a matter of law. The Court finds that there *is* a genuine dispute of material fact in regard to the first ground, but it finds there is *no* genuine issue for the second, necessitating dismissal of Plaintiffs' lawsuit.

**A. The Statute of Limitations**

Although there is no express provision for a statute of limitations in promissory estoppel cases, New York law[3] provides that where no limitations period is specifically prescribed, an action must be commenced within six years. N.Y. C.P.L.R. § 213(1) (McKinney 2019). The statute of limitation period is generally "computed from the time the cause of action accrued." *Id.* § 203(a); *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 967 N.E.2d 1187, 1190 (N.Y. 2012) (An action accrues "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court.") (internal citations omitted). Promissory estoppel actions generally accrue at the time of the breach of the promise. *Schmidt v. McKay*, 555 F.2d 30, 36 (2d Cir. 1977); *cf. Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993) ("In New York, a breach of contract cause of action accrues at the time of the breach").

In this case, the alleged 1995 oral promise at issue is most clearly reflected in the declaration of Taharqa Aleem:

> [U]pon notice and return of the $30,000 (which had no time restrictions on when such notice could be made), Experience would deliver the Guitars back to us.

Taharqa Decl. ¶ 8 (citing SAC ¶ 22). Put another way, Experience was allegedly promising that if the twins gave notice of wanting the guitars back under the 1995 oral promise *and if* the twins returned the $30,000, *then* Experience would return the guitars. Therefore, to break that promise, Experience would have to refuse to return the guitars

---

[3] Because the parties have briefed this matter citing New York law, the Court deems that the parties have impliedly consented to its application. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

after the twins gave notice that they wanted the guitars returned and furnished the $30,000.

Experience argues that there are two times when the twins triggered the statute of limitations: the 2001 negotiations led by Cassin and the 2006 meeting between the twins and Janie Hendrix. Plaintiffs aver that the twins did not authorize the 2001 negotiations, that the 2006 meeting did not discuss the guitars, and that, in any event, these interactions did not trigger accrual of the claims at issue today. The Court finds that the 2001 negotiations, even if they occurred with the twins' approval, did not constitute accrual of the claim. It also finds that there is a genuine dispute of material fact over the specific details of the 2006 meeting and related conversations.

Experience urges the Court to view the 2001 negotiations as the first time it broke the alleged promise because the twins — through their agent — put Experience on notice that they wanted the guitars back. But there are three issues with Experience's interpretation of the event, assuming for the moment that Cassin was operating under the Ghetto Fighters' authority. *First*, any notice given of the twins wanting the guitars back was made generally, not pursuant to the alleged 1995 promise — indeed, the agreement Cassin negotiated does not mention any existing buyback promise. *See* Weber Decl. Ex. Q. *Second*, Cassin did not offer Experience $30,000 on the twins' behalf; rather, he offered Experience $80,000 and the provision of several recordings featuring Jimi Hendrix. *Id.* And, *third*, the twins never *actually* proffered the money because, according to Cassin, they "did not have the $80,000." Cassin Decl. ¶ 6. Put simply, Cassin's negotiations consisted of an entirely separate and unconsummated deal unrelated

9

to the alleged 1995 oral promise; it was impossible for Experience to break its alleged promise when the twins' agent never actually triggered it.

Experience seeks to frame the 2006 meeting, too, as a trigger of the statute of limitations. According to Anderson's memorandum memorializing the 2006 meeting, Taharqa and Tunde Ra began the meeting by requesting to buy back the guitars, indicating that they had recently come into money. *See* Anderson Memo at 1. Anderson's memorandum indicates that the twins had decided to remove the guitars from auction because the deal had a "condition that they be given the opportunity to buy them back someday." *Id.* The memorandum continues: "[The twins] claimed to have had a conversation with [Hendrix's husband] Troy Wright regarding this matter in 1998, and that he had agreed to the alleged terms." *Id.* They claimed Wright was acting as an agent of Experience in 1998, even though he was not an employee of Experience as of 2006. *Id.* According to Anderson's document, Hendrix offered to take the request to Experience's board of directors, and the twins said they were satisfied with her efforts, regardless of whether the board agreed to the request. *Id.*

The Plaintiffs do admit to having "a brief in person conversation . . . in New York City" with Wright "to facilitate the terms of the promises and understanding that the Aleems set forth in their Second Amended Complaint." Pls.' Interrogatory Resp. at 2. But, as to the 2006 conversation, Taharqa denies that they mentioned the guitars at all. Taharqa Decl. ¶ 26.

In order to find that this conversations triggered the statute of limitations, the Court would have to find there is no genuine dispute that: (1) these conversations actually happened; (2) that the twins were referring to the terms of the alleged oral

10

promise of 1995; and (3) that the twins had proffered $30,000 with the expectation that the guitars would be promptly returned. Putting aside the question of whether Taharqa's denial is sufficient to create a dispute over the contents of the conversations, the memorandum — in addition to the declarations of Anderson and Hendrix — is simply too thin of a record to make the latter two findings as a matter of law. Therefore, this Court cannot grant Experience's motion for summary judgment on the statute of limitations grounds.

### B. The Promissory Estoppel Claim

Promissory estoppel requires a plaintiff to prove three elements: "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance." *Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 253–54 (S.D.N.Y. 2005) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996)). "Each element must be present before a promissory estoppel claim can be sustained." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 734 (S.D.N.Y. 1989) (citing *Esquire Radio & Elec. v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir. 1986)). Where, as here, a contract is barred by the Statute of Frauds, *see Aleem*, 2017 WL 3105870, at *5, New York law adds a heightened injury element requiring plaintiff to demonstrate "unconscionable" injury. *See In re Estate of Hennel*, 80 N.E.3d 1017, 1022 (N.Y. 2017).

#### 1. A Clear and Unambiguous Promise

The alleged 1995 oral promise is clear and unambiguous; according to Taharqa, Janie Hendrix promised the twins that Experience would return the guitars if the men indicated they wished to regain possession of the guitars and proffered $30,000. *See* Taharqa Decl. ¶ 8.

The larger question is *whether the promise was made at all*. On the one hand, Taharqa avers that Janie Hendrix made this promise to him and his brother. *Id.* On the other, Hendrix avers, "We would never have paid money for the Guitars as a 'license.' We did not loan the Aleems that money." Hendrix Dec. ¶ 7.

"[C]ourts reviewing summary judgment motions 'generally should not weigh evidence or assess the credibility of witnesses.'" *Bentley v. AutoZoners LLC*, 935 F.3d 76, 86 (2d Cir. 2019) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011)). "Nevertheless, 'in the rare circumstance where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete,' to establish a triable issue of fact, it may well 'be impossible' for the court 'to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.'" *Bentley*, 935 F.3d at 86 (alteration in original) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)). In order to conclude that the testimony of a party cannot raise a genuine issue of material fact, the court must find such contradictions, "inescapable and unequivocal." *Bentley*, 935 F.3d at 86 (internal quotation removed).

Experience urges the Court to apply the exception of *Jeffreys* and *Rojas* to the declaration of Taharqa due to, in particular, the steady erosion of his story regarding the twins' relationship to Cassin during the course of this litigation. But even if the Court were to do so — and thereby find that Cassin was negotiating on behalf of the twins to repurchase the guitar — the Court would be unable to find that there is no genuine

dispute of material fact as to whether Experience made a clear and unambiguous promise to the Ghetto Fighters in 1995.

As an initial matter, Taharqa's declaration that Hendrix made the 1995 promise is not contradicted by any of his own testimony. *Compare* Taharqa Decl. ¶ 8 ("[W]e would be able [to] license the Guitars to defendant Experience for a one-time sum of $30,000 . . . .") *with* SAC. ¶ 22 ("The pertinent terms of the Licensing Agreement were that . . . the Aleem Brothers would license the Guitars to defendant Experience for a one-time sum of $30,000.") (affirmed by Decl. of Taharqa Aleem ¶ 2, Weber Decl. Ex. N). And any contradictions raised by the circumstances or substance of the 2001 negotiations or the 2006 meeting have plausible, albeit unlikely, explanations: Taharqa and Tunde Ra could have forgotten about the promise in 2001 and 2006, for instance, or they could have chosen for some strategic reason not to trigger the 1995 promise during either interaction with Experience.[4] A reasonable jury could make one of those inferences on this record, and therefore the Court is bound to not find in Experience's favor on this ground. *See Bentley*, 2019 WL 3884248, at *6 ("[A] court should not disregard testimony if there is a plausible explanation for its contradiction by other evidence.").

2. *Justifiable Reliance*

The Court finds that there is a genuine dispute of material fact over whether the twins justifiably and foreseeably relied on Experience's promise, assuming the promise was made. The record shows that the twins reasonably relied upon Experience's promise

---

[4] Although this is made even more unlikely by a 2014 email from the twins' then-attorney Kendall Minter. *See* Weber Decl. Ex. Y. While inquiring about matters related to a license for Experience Hendrix to use a recording of Mojo Man in a recently released album, Minter asked for "a fully signed copy of the contract pursuant to which the Aleems sold to the Hendrix Estate" the guitars. *Id.* at ECF p. 3. Regardless, this document does not compel the Court to find for Experience as a matter of law on this point.

by taking the guitars off the auction block and giving them to Experience in exchange for $30,000, soon after Experience made its promise. *See* Taharqa Decl. ¶ 10. But for Experience's promise, the Ghetto Fighters would have sold the guitars or chosen to keep them.

3. *Unconscionable Injury*

"To invoke the power that equity possesses to trump the Statute of Frauds, [Plaintiffs] must demonstrate 'unconscionable' injury, i.e., injury beyond that which flows naturally ([that is,] expectation damages) from the non-performance of the unenforceable agreement." *Merex A.G. v. Fairchild Western Systems, Inc.*, 29 F. 3d 821, 826 (2d Cir. 1994). For example, lost sales, opportunities, and clients, even when significant, do not give rise to an unconscionable injury. *See Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 342 (S.D.N.Y. 2008). Nor does the need to pay an "exceptionally high" cover price to make up for the broken promise suffice. *See ABA Refinery Corp. v. Republic Metals Refining Corp.*, 15 Civ. 8731 (GHW), 2017 WL 4481170, at *6 (S.D.N.Y. 2017).

On its order partially granting Experience's motion to dismiss, this Court ruled that Plaintiffs had "establish[ed] a claim for promissory estoppel . . . , but just barely." *Aleem*, 2017 WL 3105870, at *6. This Court, quoting the Plaintiffs' complaint, characterized the injury as the "conversion of the two historic, iconic and extremely valuable items for 'a mere $30,000.'" *Id.* After the benefit of discovery, this injury, though well-plead, is insufficient to establish unconscionability.

*First*, Plaintiffs have offered no evidence for the value of the guitars. Although the guitars were initially sold for $30,000, Plaintiffs have offered no documentary

14

evidence regarding how much the guitars would sell for on the open market today and whether that amount is significantly more than $30,000. Although Taharqa avers that the twins could have received as much as $200,000 for a single guitar at auction, Taharqa Decl. ¶ 8, and the Second Amended Complaint alleges the guitars are now worth at least $1 million each, SAC ¶ 13 n.2 (affirmed by Decl. of Taharqa Aleem ¶ 2, Weber Decl. Ex. N), the Plaintiffs provide no documentation from any appraiser indicating that estimated value. *See* Weber Decl. Ex. CC (email from Christie's representative indicating that the auction house has no record of the original attempt to sell the guitars). Without some admissible appraisal value, the Court cannot use Taharqa's declarations alone to create a genuine dispute of material fact on this point. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Without more, the monetary injury is precisely what would have flowed naturally from the enforcement of the promise: $30,000 — hardly unconscionable.

*Second*, Plaintiffs have offered no evidence that the guitars are "historic," "iconic," or otherwise have nonmonetary value sufficient to create an unconscionable injury from their absence from Plaintiffs' possession. Although the record indicates that the guitars were indeed used by Jimi Hendrix for the recording of specific songs, *see* Weber Decl., Ex. X at ECF pp. 34, 35, the record does not indicate the import of those songs, nor does it indicate the import of the guitars to Jimi Hendrix or his career.[5]

---

[5] Plaintiffs do provide a single magazine article that calls the guitars "two of the stranger guitars that Jimi Hendrix ever owned." Taharqa Decl. Ex 1. But they do not provide any information about the publication, the author, or the basis for the author's knowledge. The Court does not consider it because it would be inadmissible at trial. *See* Fed. R. Civ. P. 56(c)(2).

Indeed, the Second Amended Complaint alleges that Hendrix *often* gave guitars to his bandmates, further casting doubt on the iconic status of these *particular* guitars. *See* SAC ¶ 9.

In any event, courts that have faced a broken promise to sell a valuable artifact or piece of art have all declined to find the unique nature of the item as creating unconscionable injury. *See, e.g.*, *Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 248–49, 254 (S.D.N.Y. 2005) (finding loss of "superior work from a highly desired period in a well-known artist's oeuvre" not unconscionable (internal quotations removed)); *Hoffmann v. Boone*, 708 F. Supp. 78, 79, 82 (S.D.N.Y. 1989) (finding loss of work of art valued at about $120,000 not unconscionable). As Judge Pauley of this District wrote when deciding that a broken promise to sell three $1 million paintings was not unconscionable: "The standard of 'unconscionability' cannot be judged solely based on Plaintiff's personal tastes." *Robins v. Zwirner*, 713 F. Supp. 2d 367, 377 (S.D.N.Y. 2010).

*Third*, finding in Plaintiffs favor on this point would go against the counsel of the Second Circuit and the New York Court of Appeals that a finding of unconscionable injury should be "limited" and "rare." *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977); *In re Estate of Hennel*, 80 N.E.3d 1017, 1024 (N.Y. 2017). "The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result." *Hennel*, 80 N.E.3d at 1023 (quoting *Philo Smith*, 554 F.2d at 36). Promissory estoppel is meant to be a backstop, yes, preventing manifest injustice from occurring due to rigid rules of contract law. *See Hennel*, 80 N.E. 3d at 1022 ("[E]quity will not permit the statute of frauds to be used as an instrument of

16

fraud." (internal quotation omitted)). But if injuries such as the one claimed here were viewed as unconscionable, then *any* purchaser of a pop-culture artifact would be vulnerable to the risks of trial solely because the person who sold them the artifact had regrets.

"In short, [Plaintiffs'] allege that they did not receive the full benefit of their oral bargain. If these facts were sufficient to prevent application of the statute of frauds, the statute of frauds would be 'severely undermined.'" *Id.* at 1024 (quoting *Philo Smith*, 554 F.2d at 36). Accordingly, the Court finds that the Plaintiffs have not created a genuine dispute of material fact regarding whether they suffered an unconscionable injury as a result of Experience's actions. The Court GRANTS Experience summary judgment on this ground.

### C. Declaratory Judgment

In addition to its motion for summary judgment of Plaintiff's Second Amended Complaint, Experience moves for summary judgment on its Counterclaim for Declaratory Judgment. Plaintiffs did not address this aspect of the motion at all in their opposition papers. Because the Court has at this time dismissed all claims that Plaintiffs have brought to support their rights in the guitars, the Court grants Experience's motion and makes the following declaratory judgment under 28 U.S.C. § 2201:

> Plaintiffs have no ownership or rights in the Mosrite Joe Maphris brand doubleneck guitar and Acoustic brand Black Widow electric guitar they sold to Experience Hendrix, LLC in 1995 or 1996.

The Court declines to rule that Experience Hendrix, LLC is the "sole and exclusive owner of the Guitars," Answer at 11, as the controversy before it is only between these plaintiffs and defendants.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motions for summary judgment is GRANTED as to the Second Amended Complaint and the Counterclaim for Declaratory Judgment. The Clerk of Court is respectfully directed to terminate the motions, Docs. 61, 77,[6] and close the case.

It is SO ORDERED.

Dated: September 26, 2019
New York, New York

Edgardo Ramos, U.S.D.J.

---

[6] The defendants' motion for oral argument on its motion is DENIED as moot.